Filed 1/12/16  In re T.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T.G., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E064055 |
| Plaintiff and Respondent, | (Super.Ct.No. J257165) |
| v. | OPINION |
| A.G. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant K.G.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant A.G.

1

Jean-Rene Basle, County Counsel, and Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

Defendants and appellants K.G. (Mother) and A.G. (Father) are the biological mother and the alleged father, respectively, of one-year-old T.G. (the child). They appeal the juvenile court's order terminating parental rights, arguing the juvenile court prejudicially erred in failing to consider the statutory relative placement preference when placing the child. We reject the parents' contentions and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father had a history with child protective services due to the parent's substance abuse and acts of domestic violence. Father also had a criminal history and had sexually abused the child's half sibling, A.E. On May 7, 2014, Father's services were terminated as to the child's half sibling, T.I.G. On October 21, 2014, Mother's services were terminated for the child's half siblings, A.E.G., A.E., and T.I.G. (half siblings).

While services were pending in the half siblings' dependency cases, in September 2014, Mother informed the San Bernardino County Children and Family Services (CFS) that she was pregnant and that her scheduled due date for the child was November 23, 2014. At a dependency hearing on October 21, 2014, for the half siblings, Mother informed CFS that she was still pregnant. CFS, however, was notified on October 22, 2014, that Mother had already given birth to the child, and had taken him to

2

visit his half sibling T.I.G., who was placed with a paternal uncle, C.G.  On October 23, 2014, through MediCal records, CFS verified the child's birth date as the first week in October 2014.  The social worker later discovered that Mother's estimated due date was October 23, 2014; and that Mother had given the social worker paperwork noting the October date crossed out and the November date written in.

On October 23, 2014, the social worker obtained a detention warrant for the child, and went with police officers to Mother's last known address to serve the warrant.  A man answered the door and stated that Mother had moved out three weeks earlier when she gave birth to the child.  The man also reported that he saw Mother drive away with Father in his blue truck and that Mother was currently living with Father.

The social worker and officers thereafter went to Father's home.  Father stated that he had not seen Mother in four months, but admitted he was the father of the child.  When the social worker informed Father of the court date, he complained that he had no way to get to court, and when offered a bus pass or gas card, he complained that he had no way to obtain them.

The social worker and officers subsequently attempted to contact Mother at the address listed for Mother's MediCal, which was the home of Mother's great-aunt.  The great-aunt stated that she would not allow Mother in her house, noting Mother was a " 'bad person and an unfit mother.' "  The great-aunt gave the social worker the maternal grandmother's phone number, and the social worker attempted to call the number but the phone was turned off.  The social worker left a message for Mother on the maternal

grandmother's voicemail. The social worker and officers also went to the maternal grandmother's last known address but no one was home. The social worker attempted to call phone numbers provided by Mother but Mother's phone numbers were disconnected. As such, the social worker requested a warrant of apprehension for the child.

On October 27, 2014, CFS filed a petition on behalf of the child pursuant to Welfare and Institutions Code[1] section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling).

Neither Mother nor Father were present at the October 28, 2014 detention hearing, and minor's counsel informed the court that the whereabouts of the child were still unknown. The court formally detained the child, finding a prima facie case established detention, removed the child from parental custody, and signed the warrant for apprehension of the child.

The social worker recommended in the November 14, 2014 jurisdiction/disposition report that the allegations in the petition be found true and that no reunification services be provided to Mother. The social worker further recommended that Father remain alleged and not entitled to services and that a section 366.26 hearing be set. The report stated the whereabouts of Mother and the child were still unknown, and the social worker had informed the maternal grandmother, the paternal uncle C.G., and the paternal grandparents that a detention hearing had been held.

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

4

Mother's drug history included the abuse of methamphetamine, opiates, and marijuana. Throughout Mother's other dependency cases, she had failed to drug test regularly, often tested positive for drugs, and was terminated from substance abuse programs. Father's drug history included arrest for possession of a controlled substance with a loaded firearm in 2008. Father also admitted that he had used medical marijuana for pain management but denied using any other drugs. During the half siblings' dependency case, Father was required to drug test and participate in substance abuse treatment, but he failed to do so. In addition, throughout the half siblings' dependency case, Mother and Father had ongoing domestic violence disputes with Mother being granted a restraining order against Father that doesn't expire until February 2017. Despite the order, the parents continued to have contact with each other. Neighbors had informed law enforcement that there was "a lot of 'violence' " occurring in the home between Mother and " 'her boyfriend.' " Additionally, Mother had often displayed injuries as a result of the domestic violence between she and Father when visiting her children. Both Mother and Father had failed to attend many of their court-ordered programs.

At the November 18, 2014 jurisdictional/dispositional hearing, neither Mother nor Father were present, and the child's whereabouts remained unknown. The parents' attorneys set the matter contested and the court continued the hearing.

Neither Mother nor Father appeared at the continued jurisdictional/dispositional hearing set for December 11, 2014. The child's whereabouts remained unknown, and the

5

court continued the matter to January 14, 2015, because the court could not proceed without the child.

Again, neither Mother nor Father were present at the continued January 14, 2015 hearing, and the child's whereabouts remained unknown. As such, the court continued the matter, and CFS advised the court that the district attorney's abduction unit had been notified.

The child was eventually taken into custody on March 3, 2015. At a hearing on March 5, 2015, Mother and the child were present. Father was in custody and not present. The court continued the hearing to the following day so Father could be transported from custody.

At the continued jurisdictional/dispositional hearing on March 6, 2015, the parents were present; however, the matter was continued after a conflict was declared between Father and his counsel. At that time, Mother requested visitation with the child. The court denied Mother's request due to her being a flight risk and a danger to the child.

The jurisdictional/dispositional hearing was held on March 19, 2015. Both parents were present. At that time, Father testified. In relevant part, he stated that he did not know the child was born until the social worker advised him and that Mother had tried to hide her pregnancy fearing CFS would take the child. Father wanted his family to take care of the child, explaining that his brother, C.G., had custody of the half sibling T.I.G., who was about 15 months old. Father also stated that his sister would consider taking the child, but he believed it best if the child lived with his brother.

Following argument, the court found the allegations in the petition true and declared the child a dependent of the court. The court also found Father to be an alleged father and not entitled to services. The court denied Mother services pursuant to section 361.5, subdivision (b), as well as visitation, finding visitation between Mother and the child to be detrimental. The court found that no known maternal or paternal relatives were available at the time and noted that relative assessments were occurring as to Father's brother, C.G., and a maternal great-aunt. Minor's counsel requested that the child be placed in a concurrent planning home as soon as possible, whether it is a relative or "otherwise." The court granted that request and authorized CFS to place the child in a concurrent planning home. The court set a section 366.26 hearing and advised the parents of their appellate rights.[2]

On March 3, 2015, the child was placed in the home of Mr. and Mrs. J. The child, who was nine months old at the time of the July 17, 2015 section 366.26 report, was described as a happy and " 'lovable' " baby. His recent developmental assessment indicated that he was slightly behind in development, had some delays in fine and gross motor skills, and was not yet able to roll over all the way. His caregivers/prospective adoptive parents, however, were providing him with a stimulating environment for growth and development. The child was also behind in immunizations at placement, but by July 2015 was caught up. When the child was initially placed with his caregivers, he

_____

[2] Neither parent filed a petition for extraordinary writ; and between the jurisdictional/disposition hearing and the section 366.26 hearing, neither parents nor relatives petitioned the court for a change of placement for the child.

7

would not nap for more than 15 minutes at a time and would awaken startled and screaming. At the time of the report, however, the child was napping from one to one and one-half hours at a time without startling. The child was very attached to his caregivers and their adult daughter who also lived in the home.

CFS had attempted to contact both the maternal grandmother and the maternal great-aunt to be assessed for relative placement. The social worker had phoned the maternal grandmother but she did not answer her phone and her voicemail was full. CFS had submitted a request through its Relative Assessment Unit (RAU) for the maternal great-aunt; however, the maternal great-aunt later asked that she not be assessed. Due to the flight risk, no emergency relative assessments were done at the time of removal.

The social worker also investigated and considered the paternal uncle C.G. for possible placement of the child. When CFS was made aware that Mother was pregnant, the social worker had spoken with C.G., the paternal uncle who had legal guardianship of the half sibling. C.G. reported that he did not think he had enough room in his home for another child and also believed he would not be approved. During a home visit for the half sibling, C.G. mentioned to the social worker that Mother had brought the child to visit with his half sibling. When the social worker asked C.G. why he had not immediately contacted CFS once the child was born as previously discussed, C.G. said he thought CFS already knew. C.G. later made statements that he had "let it slip that the mother had the child."

8

On March 15 and April 30, 2015, the social worker again spoke with C.G. regarding CFS's concerns about placing the child with him. C.G. again "admitted that he did not mean to inform the [social worker] that the mother had brought [the child] to the visit" and that if he " 'had to' " he would adopt both the child and the half sibling. C.G. had previously reported that he had chosen legal guardianship with the half sibling because he wanted to give Mother a chance to get him back. About an hour after one of the home visits with C.G., the social worker received a call from Mother asking why the child was not placed with C.G. This raised an additional concern to the social worker about C.G.'s motivation in having the child placed with him, since C.G. appears to be continuing to have regular contact with Mother and is informing Mother of his discussions with CFS.

On April 27, 2015, the social worker received a phone call from a maternal uncle, who stated that Mother had called him the day before and asked him to be assessed for the child's placement. The maternal uncle was only 19 years of age and living in the state of Washington with his girlfriend. CFS informed the maternal uncle of the procedure for out-of-state placements, the fact that the timeline for relative placement had passed since the child was already in a concurrent planning home, and of the recommendation to keep the child in his current placement.

On May 4, 2015, the social worker participated in a case assessment meeting regarding the child's placement with C.G. The participants recommended that the child remain in his current placement due to the concerns about C.G.'s ability to protect the

9

child. On May 5, 2015, CFS met with Mother and explained to Mother that assessing relatives for placement of the child was no longer being considered. The maternal grandmother thereafter went to CFS twice and left messages requesting placement of the child. The maternal grandmother also wanted her 18-year-old daughter assessed for placement. The maternal grandmother was informed that she had previously been assessed by RAU for the half siblings and was denied placement of the half siblings due to her cumulative criminal history. Mother had previously been told that the relative placement timelines had passed and that the child was already in a concurrent planning home.

The caregivers desired to adopt the child and the child and his caregivers were mutually attached. The child related well to his caregivers and saw them as parental figures. The caregivers saw the child as their son and a part of their family. The caregivers desired to adopt the child and provide for the child's emotional, mental, educational, and physical needs. The caregivers were open to written contact with Mother, including letters and pictures appropriate for the child.

The contested section 366.26 hearing was held on July 23, 2015. Both parents were present and Father's counsel advised that Father wanted to testify about placement of the child with C.G. Counsel for CFS objected since Father was only an alleged father and had no right to request relative placement. Minor's counsel also objected as irrelevant since the child was in a concurrent home and there was no need for a change in placement. Mother's counsel also raised the issue of placement. The court advised the

parties that the only issue before the court was whether the child was adoptable; that placement was not an issue at the section 366.26 hearing; and that Mother could only testify regarding termination of parental rights and adoption. Mother testified regarding her relationship with the child and strong emotional attachment to the child, noting that she had cared for the child the first five months of his life, and requested a less restrictive permanent plan for the child such as guardianship. Mother acknowledged that the child was her fourth child and that her three previous children had been removed from her care.

Following argument, the court found the child to be adoptable and terminated parental rights. The court also found no exceptions to adoption and noted that relatives were assessed but excluded as they had assisted Mother in avoiding CFS or hid Mother and did not cooperate with CFS even after a warrant had been issued. This appeal followed.

II

DISCUSSION

Mother contends the juvenile court abused its discretion when the court prejudicially erred by failing to consider the relative placement preference when determining the child's placement. Father simply asserts, "if this Court reverses the judgment terminating parental rights for mother on her claims, then the termination of [Father's] parental rights should also be reversed—even in the absence of any independent error pertaining to him."

11

CFS responds that Father's appeal should be dismissed since he is only an alleged father and has no standing to bring his appeal. In regard to Mother, CFS asserts Mother waived her right to challenge the dispositional findings and orders of placement since she failed to file an extraordinary writ. CFS further argues that assuming Mother did not waive her right to raise the issue of relative placement, substantial evidence supports the juvenile court's finding that relative placement preference was considered and that issues pertaining to placement did not apply at the section 366.26 hearing terminating parental rights.

A.     *Father's Appeal*

Standing is an issue of law which we review de novo. (*Scott v. Thompson* (2010) 184 Cal.App.4th 1506, 1510.) "California law distinguishes 'alleged,' 'biological,' and 'presumed' fathers. [Citation.]" (*Gabriel P. v. Suedi D.* (2006) 141 Cal.App.4th 850, 857.) A father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled. (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 159.) A presumed father meets one or more specified criteria listed in Family Code section 7611. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15 (*Zacharia D*.).) A biological father is one who has established biological paternity but has not achieved presumed father status. (*Id.* at p. 449, fn. 15.) "An 'alleged' father refers to a man who may be the father of a child, but whose biological paternity has not been established . . . ." (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596.) Similarly, a man who is not necessarily the

12

child's biological father but who may have achieved presumed father status under Family Code section 7611 is an alleged father. (*Zacharia D.*, at p. 449, fn. 15.)

Only a presumed father is entitled to family reunification services and custody of the child. (§ 361.5, subd. (a); *In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.) The juvenile court may offer or provide court-ordered reunification services to the child's biological father. (§ 361.5, subd. (a).) An alleged father is entitled only to notice, an opportunity to appear and assert a position and attempt to change his paternity status in accordance with section 316.2. (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.) Here, Father was never found to be more than the child's alleged father and he did nothing to establish his presumed status.

In addition, section 395 provides that a judgment in a dependency proceeding "may be appealed [from] in the same manner as any final judgment." However, courts have repeatedly held that a party may not challenge on appeal a ruling that only affects the rights of another. (See *In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1806; *In re Devin M.* (1997) 58 Cal.App.4th 1538.) "That is, a parent is precluded from raising issues on appeal which did not affect his or her own rights." (*In re Jasmine J.*, *supra*, at p. 1806.)

Therefore, Father lacks standing to challenge the order terminating parental rights or to join Mother's arguments regarding the child's placement with relatives because he was an alleged father and his own rights were not aggrieved by the court's refusal to consider relative placement at the termination hearing. (*In re Daniel M.* (2003) 110

Cal.App.4th 703, 707-709.) As a result, Father's appeal must be dismissed. (*Id*. at p. 709.)

B.      *Mother's Appeal*

Mother argues that the juvenile court and CFS erred by failing to consider the relative placement preference when determining the child's placement at the termination hearing, noting section 361.3 requires the court to independently consider relative placement.[3] Mother's arguments are unmeritorious.

We review the juvenile court's decision on relative placement for abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 (*Robert L.*); accord, *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1420.) In connection with its placement order, "the court is given wide discretion and its determination will not be disturbed absent a manifest showing of abuse. [Citations.] 'Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' [Citations.]" [Citation.]' [Citation.]" (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 863 (*Alicia B.*).)

---

[3] CFS contends Mother is precluded from raising the issue of placement on appeal because she failed to file a writ petition following the denial of services at the jurisdictional/dispositional hearing and setting of a section 366.26 hearing. We find CFS's forfeiture argument is without merit, because it appears Mother is not challenging the relative placement preference order following the denial of services at the jurisdictional/dispositional hearing but the juvenile court's failure to consider the relative placement preference at the section 366.26 hearing.

14

Section 361.3, often referred to as the relative placement preference, provides that preferential consideration must be given to suitable relatives whenever the placement of a dependent child must be made. (§ 361.3, subds. (a), (d).) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1); *In re Sarah S.* (1996) 43 Cal.App.4th 274, 286 (*Sarah S.*) [preferential consideration places the relative at the head of the line when the court is determining which placement is in the child's best interest].) However, the relative placement preference established by section 361.3 does not constitute "a relative placement *guarantee*." (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 798.) Although the statute does not ensure relative placement, it does "express[] a command that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 320.)

Section 361.3 identifies the factors that the court and social worker must consider in determining whether the child should be placed with a relative, including the child's best interest, the parents' wishes, the good moral character of the relative and any other adult living in the home, the nature and duration of the relationship between the child and the relative, the relative's desire to provide legal permanency for the child if reunification fails, and the relative's ability to protect the child from his or her parents. (§ 361.3, subd. (a)(1)-(8); *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033 (*Cesar V.*).) The juvenile court is required to consider the factors identified in section 361.3,

15

subdivision (a), "in determining whether placement with a particular relative who requests such placement is appropriate. [Citation.]" (*In re Antonio G.* (2007) 159 Cal.App.4th 369, 377, fn. omitted.) However, the "linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor. [Citation.]" (*Alicia B.*, *supra*, 116 Cal.App.4th at pp. 862-863.)

Accordingly, " 'regardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected.' [Citation.] Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. [Citation.] The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of [his or] her best interests." (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855 (*Lauren R.*); see *In re R.T.* (2015) 232 Cal.App.4th 1284, 1295 (*R.T.*).)

Section 361.3 governs in two situations: (1) at the dispositional hearing when the child is removed from parental custody (§ 361.3, subd. (a)); and (2) when "a new placement . . . must be made . . . ." (§ 361.3, subd. (d); see *Cesar V.*, *supra*, 91 Cal.App.4th at p. 1032.) The second situation is not just limited to when reunification services are being offered. The relative placement preference also applies when a new placement becomes necessary after reunification services are terminated, but before parental rights are terminated and adoptive placement becomes an issue. (*Cesar V.*,

16

*supra*, at p. 1032.)  However, the provision does not apply "after parental rights have been terminated and the child has been freed for adoption."  (*Id*. at p. 1031, citing *Sarah S.*, *supra*, 43 Cal.App.4th at p. 285.)

The policy consideration underlying the relative placement preference at the disposition stage is to find a temporary caretaker who will meet the child's physical and psychological needs while cooperating in reunification efforts.  "A relative, who presumably has a broader interest in family unity, is more likely than a stranger to be supportive of the parent-child relationship and less likely to develop a conflicting emotional bond with the child." (*Robert L.*, *supra*, 21 Cal.App.4th at p. 1064.)  However, "[o]nce reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability."  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  In fact, there is a rebuttable presumption that continued foster care is in the best interest of the child.  (*Id*. at p. 310.)

Appellate courts have consistently held that the relative placement preference applies at least as long as reunification efforts are ongoing.  (*Sarah S.*, *supra*, 43 Cal.App.4th at p. 285; *Robert L.*, *supra*, 21 Cal.App.4th at p. 1064; *In re Jessica Z.* (1990) 225 Cal.App.3d 1089, 1098-1099, superseded by statute on other grounds as stated in *Cesar V., supra,* 91 Cal.App.4th at p. 1032; *In re Baby Girl D.* (1989) 208 Cal.App.3d 1489, 1493-1494, superseded by statute on other grounds as stated in *Cesar V., supra,* at p. 1032.)  As stated in *Sarah S.*:  "[T]he preference afforded by section 361.3 applies to placements made before the juvenile court has terminated reunification

17

services.  When reunification has failed, however, and the juvenile court has before it a proposed permanent plan for adoption, the only relative with a preference is a 'relative caretaker' (if there is one seeking to adopt) and the only preference is that defined by subdivision (k) of section 366.26 (that is, a preference to be first in line in the application process)."  (*Sarah S.*, *supra*, 43 Cal.App.4th at pp. 285-286; see *Lauren R.*, *supra*, 148 Cal.App.4th at p. 855.)  Because there is nothing in the record to suggest that C.G., the maternal great-aunt, the maternal grandmother, the maternal uncle, and the maternal aunt were ever the child's caretakers, it follows that they were not entitled to any statutory preference for adoption of him.

Moreover, contrary to Mother's contentions, the juvenile court and CFS properly considered section 361.3.  There were no emergency relative assessments conducted here at the time the child was formally removed at the October 2014 detention hearing because Mother was still missing with the child and their whereabouts were unknown.  During that time, CFS contacted and attempted to contact relatives regarding the child's whereabouts and advised them of the dependency case and detention hearing.  The social worker spoke with a maternal great-aunt, who stated she would not allow Mother in her house, and called the maternal grandmother and left a message for Mother.  After locating the child, and before the jurisdictional hearing in March 2015, CFS initiated relative assessments of Father's brother C.G. and the maternal great-aunt as possible relative placements for the child.  Meanwhile, the child was placed in a concurrent home with his prospective adoptive parents on March 3, 2015; and at the March 19, 2015

18

jurisdictional/dispositional hearing, the court ordered CFS to continue to assess C.G. and the maternal great-aunt as possible relative placements for the child.

CFS had investigated and considered C.G. but was concerned C.G. would not protect the child from Mother. While Mother was pregnant with the child, C.G. had informed the social worker that he did not think he had enough room and did not think he would be approved for possible placement of the child once he was born. After the child was born, the social worker visited C.G. and C.G. "let it slip" that Mother had brought the child to a visit with the half sibling. However, C.G. did not notify CFS of the child's birth. After the child was located, the social worker spoke to C.G. twice regarding her concerns with placing the child with C.G., namely that he had failed to notify CFS of the child's birth and admission that he had not intended to advise CFS of the child's visit. The social worker was also concerned that C.G. had elected guardianship for the half sibling so Mother would have a "chance to get him back." Finally, within an hour after discussing placement with C.G., Mother had called the social worker wanting to know why the child was not being placed with C.G. CFS had also investigated and considered the maternal great-aunt. Indeed, the social worker had submitted a request for the maternal great-aunt through RAU; however, the maternal great-aunt later asked not to be assessed.

Upon request, the social worker also considered the maternal uncle as a possibility for the child's placement. However, the social worker's investigation revealed that the maternal uncle was only 19 years old and living in the state of Washington with his

girlfriend. The maternal aunt was also considered after the maternal grandmother twice contacted CFS requesting placement and that her 18-year-old daughter be considered. However, the maternal uncle's and the maternal grandmother's requests to consider an 18-year-old girl for relative placement did not appear sincere. Instead it appeared to be a subterfuge for Mother to control placement and have easy access to the child. Moreover, there was no indication the 19-year-old maternal uncle or the 18-year-old maternal aunt would protect the child from Mother as required by section 361.3, subdivision (a). The social worker's investigation further revealed that placement of the child with the maternal grandmother was also not a possibility. The maternal grandmother had been assessed by RAU for placement of the half siblings and was denied due to her cumulative criminal history. There was also no evidence in the record that the maternal grandmother had requested an exemption. More importantly, there was no indication that the maternal grandmother would protect the child from Mother as statutorily required. Thus, the record does show that the juvenile court considered relatives for placement, but found that it would not be in the child's best interest to change the child's placement and place him with the assessed relatives.

Mother's heavy reliance on *R.T.*, *supra*, 232 Cal.App.4th 1284, to support her claim that the juvenile court here failed to consider section 361.3 relative placement preference is misplaced. There, a baby boy was exposed in vitro to numerous illicit drugs. (*Id.* at p. 1292.) Within days of the child's birth and detention, the father gave the agency the names and addresses of two of his sisters and requested they be considered for

20

placement. (*Id.* at p. 1293.) Despite being given this information, the agency failed to give notice to the two paternal aunts of the proceedings in violation of section 309. (*R.T.*, at p. 1296.) The minor was detained with the father's former girlfriend. Within two weeks, the paternal aunts voluntarily came forward and requested placement. (*Id.* at p. 1293.) The paternal aunts were evaluated and both of their homes were approved by the time the minor was just three months old. (*Ibid.*) However, the agency advised the aunts and reported to the juvenile court that neither home was considered for placement because there were no plans to move the minor from his current non-relative placement. (*Id.* at p. 1297.) At the hearing on the aunts' petition for a modification of the placement order, the social worker testified that they evaluate relatives for placement but they "do not receive preference" (*id.* at p. 1294) in contravention of the plain language of section 361.3. The reviewing court therefore found the agency had failed to abide by its statutory obligations, and the juvenile court had abused its discretion in failing to apply the correct legal standards regarding the relative placement preference. (*R.T.*, at pp. 1299-1300.)

The facts here are not in any way similar to *R.T.* From the beginning of the dependency proceedings in October 2014, CFS had many conversations with different relatives regarding the child's placement. Indeed, even before the child was born, CFS discussed possible placement of the child with the half sibling in C.G.'s home. There were no emergency placements with relatives because Mother absconded with the child for nearly five months. After the child was located, the child was placed in the home of

21

his caregivers on March 3, 2015, while CFS considered and investigated relatives for possible placement. Substantial evidence in the record shows that the juvenile court and CFS considered relatives for placement as required by section 361.3, despite the fact reunification services had been terminated and the child had been placed in a stable, secure, and loving home with caregivers who desired to adopt him. However, it was determined that it would not be in the child's best interest to change the child's placement and place him with relatives.

Mother appears to argue that there is a relative preference for adoption. However, "[t]here is no relative placement preference for adoption." (*Lauren R.*, *supra*, 148 Cal.App.4th at p. 855.) By the time of the section 366.26 permanency planning hearing, emphasis on reunification was long past and adoption was the recommended permanent placement. The issue before the juvenile court at the section 366.26 hearing was: (1) whether the child is adoptable; and (2) whether any exceptions to adoption apply. (*In re Christopher M.*, *supra*, 113 Cal.App.4th at p. 160; accord, § 366.26, subd. (c).) We find the relative preference of section 361.3 was no longer applicable at the time of the section 366.26 hearing. Section 361.3 cannot be used in a last minute attempt to stymie a planned adoption at the final stage of termination of parental rights under section 366.26, after reunification efforts have failed. (See *Sarah S.*, *supra*, 43 Cal.App.4th at pp. 285-286.) Mother cites no authority or argument for how the court's order amounted to an abuse of discretion when it was consistent with valid authority interpreting the preference as applying post-disposition *only* when a change in placement becomes necessary.

(*Lauren R., supra,* 148 Cal.App.4th 841; *Cesar V., supra,* 91 Cal.App.4th 1023.)  We find no abuse of discretion on the part of the juvenile court in failing to further consider the relative placement requests at the section 366.26 hearing.

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:


HOLLENHORST
J.


McKINSTER
J.